UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cr-14046-Moore/McCabe

**UNITED STATES OF AMERICA,**

v.

**ROYCE GILLHAM,**

    **Defendant.**

_____/

**ACKNOWLEDGMENT OF OFFENSE ELEMENTS
AND STIPULATION AS TO AND FACTUAL BASIS FOR GUILTY PLEA**

I, ROYCE GILLHAM, agree that the facts set forth below are true and accurate and that the United States could prove these facts against me at trial. I am pleading guilty to the single count of the Information charging me with conspiracy, in violation of Title 18, United States Code, Section 371. I am pleading guilty because I am in fact guilty of violating this statute.

**NATURE OF CHARGES TO WHICH I AM PLEADING GUILTY**

I am aware of and understand the nature of the charges to which I am pleading guilty because I have discussed with my attorney the charges and what the prosecutor must prove to convict me.

I understand that the sole Count in the Information charges me with conspiracy, and that the United States must prove the following elements of the offense beyond a reasonable doubt:

    First:    two or more persons in some way agreed to try to accomplish a shared and unlawful plan;

    Second:    the defendant knew the unlawful purpose of the plan and willfully joined in it;

    Third:    during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and

    Fourth:    the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

It is a federal crime, in violation of 18 U.S.C. § 287, to knowingly present a false claim against the United States to an agency of the United States, based on a false or fraudulent material fact, acting intentionally, and knowing the claim was false and fraudulent.

1

It is a federal crime, in violation of 18 U.S.C. § 1343, to knowingly devise or participate in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises about a material fact, while acting with the intent to defraud, and causing to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

A "conspiracy" is an agreement by two or more people to commit an unlawful act. In other words, it is a kind of "partnership" for criminal purposes. Every member of a conspiracy becomes the agent or partner of every other member.

An "overt act" is any transaction or event, even one that may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

A person may be a conspirator without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.

## STIPULATED FACTUAL BASIS

Company A was a biodiesel producer with a production facility in Fort Pierce, Florida. Owner A was the President of Company A and ROYCE GILLHAM was the General Manager. Company A was registered under the Environmental Protection Agency ("EPA") Renewable Fuel Standard ("RFS") Program in 2016 with a nameplate fuel production capacity of 3,000,000 gallons per year. In October 2018, Company A's production capacity was increased to 10,000,000 gallons per year. According to its registration documents, Company A's plant could turn various feedstocks (including soybean oil or used cooking oil) into ASTM-spec biodiesel through a process called transesterification. Transesterification involved mixing a feedstock with an alcohol and a catalyst. Company A was registered with the Internal Revenue Service ("IRS") to claim refundable Biodiesel Mixture Credits worth $1 per gallon.

### Renewable Identification Numbers

Laws passed by Congress, particularly the Energy Independence and Security Act of 2007 ("EISA"), required the EPA and the IRS to promote renewable fuel production and use in the United States. To this end, the EPA created a program requiring petroleum refiners and importers to have renewable fuel in their product portfolio. Under this program, refiners and importers must produce a certain amount of

2

renewable fuel or, as an alternative to physically producing this fuel, they could purchase credits (i.e., RINs) from renewable fuel producers.

Renewable fuel producers generate RINs when they produce qualifying renewable fuels, such as biodiesel, in compliance with EPA regulations. Once a RIN is generated, it can be traded or sold on the open market. RINs could be transmitted with the volume of fuel they were generated on, or, if lawfully separated from the fuel, they could be transmitted independently of the fuel. There are various regulations governing when and how RINs can be separated from the underlying fuel. If a fuel on which RINs were generated was ultimately exported, any RINs generated on that fuel (or an equivalent number of replacement RINs) needed to be "retired" (that is, removed from circulation).

Prior to July 1, 2010, businesses dealing in RINs sent reports to the EPA about their RIN activity, including generations, purchases, and sales. After July 1, 2010, such RIN transactions were reported electronically through the online EPA Moderated Transaction System ("EMTS"). RINs could only be generated for the production of biodiesel if the biodiesel produced met a set of industry standards known as ASTM D6751. There were additional regulations governing the sale and use of fuels on which RINs had been generated, including the restriction that RINs could only be generated on a quantity of fuel once.

**Refundable Tax Credits**

The EISA also tasked the IRS with encouraging the production and use of renewable fuels. In particular, it tasked the IRS with administering tax credits associated with the production of various renewable fuels and fuel mixtures. To this end, the IRS created the Biodiesel Mixture Credit ("BMC"), 26 U.S.C. § 6426(c), which entitles registered claimants to a one-dollar tax credit for every gallon of biodiesel used to produce a mixture of biodiesel and petroleum-based "taxable" fuel which is then sold for use as a fuel or used as a fuel by the claimant.

It was illegal to claim these credits unless the fuel was produced, bought, blended, and sold in compliance with IRS regulations. The BMC was refundable, meaning that it could reduce a registered recipient's excise tax liability below zero, entitling them to a refund, or payment, from the IRS. Since its

inception, the BMC has expired several times only to be later reinstated, often allowing claimants to apply for retroactive credits from previous years.

**Criminal Conduct**

No later than 2016, Owner A began the process of opening a biodiesel plant in Ft. Pierce, Florida. ROYCE GILLHAM and others helped to assemble the necessary equipment to produce biodiesel at the plant. After the plant was assembled, production of fuel began in late 2016 or early 2017. The vast majority of the fuel produced was sold to Company B, operated by Customer A. Although the paperwork for Company B listed an address in California, Owner A and GILLHAM understood the fact that the fuel was being sent to Europe where Customer A owned a fuel production facility. Both GILLHAM and Employee A, Company A's Director of Business Development, would generate and sell RINs.

Soon after Company A began producing fuel, a meeting was held between Owner A, GILLHAM, and Employee A. At the meeting, it was decided by Owner A and Employee A that Company A would generate RINs in excess of the fuel actually produced. This was done in order to sell a greater volume of RINs than they could lawfully produce as a way to generate more money.[1] Following this decision, on March 27, 2017, GILLHAM was removed as the Responsible Corporate Officer in the online EPA database. Nevertheless, GILLHAM did not withdraw from the conspiracy, but continued to work for Owner A and Company A and was aware of the ongoing fraud.

Thereafter, Company A routinely generated RINs on loads of fuel that were not actually produced, sold, or shipped. False paperwork was created that showed the loads in question being shipped to Company B and others. However, these fictitious loads were never actually shipped and the transactions were never entered into Company A's accounting records. GILLHAM was not aware of the way Company A handled its accounting records.

---

[1] Had this matter proceeded to trial, GILLHAM would have been prepared to introduce evidence that, following the decision to generate RINs in excess of Company A's production, on March 27, 2017, GILLHAM refused to participate in the production of RINs in excess of fuel actually produced and was, at his request, removed as the Responsible Corporate Officer in the online EPA database. Thereafter, Employee A produced the fraudulent RINs and Owner A served as the Responsible Corporate Officer.

On or about February 17, 2017, Owner A and Employee A incorporated Company C, which held itself out as being involved in the feedstock transportation business but was in fact a shell company designed to make Company A's business appear legitimate. GILLHAM was aware of Owner A's purpose for Company C in the fraud.

On or about June 20, 2017, Owner A incorporated Company D, which held itself out as being in the renewable fuel business. Owner A listed his then-girlfriend as the incorporator and "VP" of Company D, even though she had no knowledge of the business whatsoever. Company D's purpose was to appear on paperwork as a "purchaser" of fuel purportedly produced by Company A. The fuel purportedly purchased by Company D did not exist. The fake sales were simply a basis for generating additional RINs and claiming additional tax credits. GILLHAM was aware of Owner A's purpose for Company D in the fraud.

GILLHAM agrees that for each year 2017-2019, Company A purported to produce considerably more fuel than it actually produced and that it sold RINS generated on the fictitious fuel as well as RINS generated on actual fuel sold for nonqualifying, non-fuel uses such as use in agricultural sprays.

### 2017 Fraud Amount[2]

In total, approximately 3,445,131 RINs were generated on 2,296,653 gallons of fuel purportedly produced and sold by Company A in 2017. These RINs were sold to third parties for approximately $2,888,810. Company A requested biodiesel mixture tax credits (worth $1 per gallon) for 2,296,653 gallons of biodiesel purportedly produced, blended, and sold for use as a fuel. Only 1,490,850 gallons were actually entered in Company A's accounting records as having been sold. The remainder, 805,803 gallons, were fictitious loads for which there was no actual production or sale. Of the 1,490,850 gallons that did appear, 155,500 gallons were sold to Company C and 261,100 gallons were sold for non-qualifying, non-fuel uses such as in agricultural sprays. The remainder was exported to Company B.

---

[2] GILLHAM cannot verify all of the specific totals listed in the following paragraphs.

### 2018 Fraud Amount

In total, 8,940,849 RINs were generated on 5,900,299 gallons of fuel purportedly produced and sold by Company A in 2018. These RINs were sold to third parties for approximately $3,842,273. Similarly, Company A requested biodiesel mixture tax credits (worth $1 per gallon) for 5,900,696 gallons of biodiesel purportedly produced, blended and sold for use as a fuel. Only 1,935,050 gallons of fuel were actually entered in Company A's accounting records as having been sold. The remainder, 3,965,646 gallons, were fictitious loads for which there was no actual production or sale. Of the 1,935,050 gallons that did appear, nearly 11,000 gallons were sales to Company C and 37,800 gallons were sold for non-qualifying, non-fuel uses such as in agricultural sprays. The remainder was exported to Company B.

### 2019 Fraud Amount

In total, 2,223,229 RINs were generated on 1,482,153 gallons of fuel purportedly produced and sold by Company A in 2019. These RINs were sold to third parties for approximately $ 882,463. Similarly, Company A requested tax credits for 1,467,331 gallons of biodiesel purportedly blended and sold. Only 680,300 gallons were actually entered in Company A's accounting records as having been sold. The remainder, 787,031 gallons, were fictitious loads for which there was no actual production or sale.

### IRS Audit

In early 2019, the IRS began an audit of Company A's tax credit requests. As part of the audit, an excise tax agent contacted various Company A employees and customers. As part of the audit, the agent asked Owner A about Company D. Owner A falsely stated that he did not know anything about Company D. When asked why Company D didn't appear in his financial statements, Owner A falsely stated that Company D had traded feedstock for biodiesel.

As part of the audit, the agent spoke to Employee A, who represented himself to be the point of contact for Company C. Employee A falsely stated that Company C had purchased fuel from Company A and had then re-sold the fuel to captains of local fishing and merchant vessels, and that they always paid in cash and did not ask for receipts.

**Third-Party Audits**

In early 2019, Auditor A was retained by a third party to investigate the validity of Company A's RINs. On March 28, 2019, Auditor A contacted ROYCE GILLHAM and proposed a meeting at Company A on April 23, 2019. During and shortly after the visit by Auditor A, Owner A, and ROYCE GILLHAM exchanged the following text messages:

| | | |
|---|---|---|
| OA: | Call me when you have a minute and you're alone |
| RG: | Will do |
| RG: | She wants [Company B President's] number and she wants to call him now with me Introducing her |
| OA: | Just say all you have is his email |
| OA: | Or call his girl in the office |
| RG: | Nah she would ask where this stuff is going and [Company B employee] wouldn't be a good person for that |
| RG: | She wants to ask questions like how are you using it, where is it going. |
| OA: | Yeah good call |
| RG: | I can try and deflect it |
| RG: | I'll let you know |
| OA: | Just say you'll get it from [Company A employee]. She's actually out of the office till Thursday |
| RG: | Ok |
| RG: | She looking into [Company B President] at the moment and she keeps saying this isn't good, and I don't like this . . . . she is concerned due to him being European |
| OA: | Yea he's our weak link for sure. She really likes the plants and he definitely is always pulling for the small guy |
| RG: | She now thinking all this stuff is going outside the USA, she looked up his address in LA it's a house |
| RG: | Not going very well |
| RG: | She also is stating that if that's the case all our RINS sold to him are supposed to be retired |
| OA: | Great!!! Fucking [Company B President] |

7

On April 24, during the second day of the audit by Auditor A, Owner A and ROYCE GILLHAM exchanged the following text messages:

> RG: [Owner A] need to talk
>
> OA: Talking to [Company B President]
>
> RG: Sandra is coming to plant right now
>
> RG: Flexi are here and she is going to ask the drivers where they are going
>
> RG: What do I do?
>
> RG: She is going through and tracking the container numbers
>
> RG: Rotterdam Netherlands
>
> RG: Apparently is very easy to track these it's just like fed ex
>
> RG: All of our BOL has the container numbers on them
>
> OA: [Company A Employee] is out of town til tomorrow. Let me talk to her first I'll catch her in the office
>
> RG: Of course I'll say nothing
>
> RG: Have you spoke to [Employee A]?

By April 30, 2019, Owner A had decided to cease production at Company A. Thereafter GILLHAM and the other Company A employees assisted in the closing of the plant.

On June 18, 2019, after selling the last load of fuel produced by the plant, Owner A asked ROYCE GILLHAM for certain Company A paperwork and exchanged the following text messages:

> OA: Ok great, I'll call you tomorrow. I need a 2017 spreadsheet for [Company D] to give to IRS.
>
> RG: Just emailed you what [Company D] did in 2017.

On or about February 6, 2020, Owner A asked ROYCE GILLHAM for help with Company A's paperwork. GILLHAM agreed and the two prepared and sent IRS Forms 8864 and 8849, requesting tax payments in the amount of $5,900,696 for Company A's purported production of 5,900,696 gallons of biodiesel mixtures in calendar year 2018.

On or about February 6, 2020, Owner A and ROYCE GILLHAM also prepared and sent IRS Forms 8864 and 8849, requesting tax payments in the amount of $1,467,331 for Company A's purported production of 1,467,331 gallons of biodiesel mixtures in calendar year 2019.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 10/4/24            By: _____
                             DANIEL E. FUNK
                             ASSISTANT UNITED STATES ATTORNEY

Date: 10/4/24            By: _____
                             ADAM C. CULLMAN
                             SENIOR TRIAL ATTORNEY
                             U.S. DEPARTMENT OF JUSTICE

Date: 10/04/2024         By: _____
                             ALLAN F. BROOKE II
                             ATTORNEY FOR DEFENDANT

Date: 09/27/2024         By: _____
                             SCOTT N. RICHARDSON
                             ATTORNEY FOR DEFENDANT

Date: 9/26/2024          By: _____
                             ROYCE GILLHAM
                             DEFENDANT